Thank you and good afternoon. Welcome to the Third Circuit. Our first case for today is United States v. Vepuri. It's number 22-1562. Judge Rindell, can you hear us? I can. Thank you, Judge. Okay. It's great to see you. Great to see you, too. Have you reserved time, counsel? Yes, five minutes, please. Terrific. That will be granted. Thank you, Your Honor. Please proceed. May it please the Court, Daniel Tenney for the United States. The District Court's error here appears to have stemmed from a misunderstanding of the overall statutory scheme, so I'd like to begin with just a brief outline of how it works here. May I ask a question here? Assuming we find your argument tenable and persuasive, do we need to look at any section other than 355A? That is, do we have to look at 356 as well? I think you could reverse the judgment based on 355. 356A supports our position, our understanding of 355. If you read 355 in the context of 356A, it makes it all the more clear that you need to get approval if you want to change your manufacturing facility. But if you just look at 355 itself, the question is whether an approval is effective for the drug at issue. And here, the conduct that was approved was marketing a drug that was manufactured at particular facilities in Belgium and in Italy. And since they manufactured it at a different facility, you could just, going on that alone, yes, you could reverse the judgment. Thank you. Can I ask you another question as well? I'm a little bit confused about the theory you're proceeding on. It seems to me that there are really two different theories here. Maybe one of them you're pursuing, one you're not. I think that one line of argument or theory could be this is a different new drug, and the other theory would be it's no longer effective. Which argument are you pursuing? I'm not sure I would frame it exactly in either of those terms. The point is that there are particular tablets of the drug hydroxyzine that were being introduced into interstate commerce here. And the question is whether... Well, on page three of your reply brief, you say the only question before us is whether an approval of an application was effective with respect to hydroxyzine. So it seems to me you're only pursuing the effectiveness argument, right? I mean, the question ultimately is whether an approval is effective with respect to the particular product that was being introduced into interstate commerce. And that product was a tablet or a group of tablets of hydroxyzine that were manufactured at a particular facility. And as to that drug product, there is no effective approval, because the only thing that was approved was manufactured at a particular facility. And so, I mean... What statutory provision says that an approval ceases to be effective if you have a change in manufacturing facilities? Indeed, doesn't 356 outline what happens when you have a change in manufacturing facilities? So what statutory section are you really proceeding under? Because I don't see one that says if you change manufacturing facilities or packaging or anything else, your approval ceases to be effective. What statutory provision says that? Your Honor, we're not saying that the approval ceases to be effective. It's just that... Well, that's what you have to say, because under 355, it says no person shall introduce unless the approval is effective. So if you're saying the approval still is effective, you don't have a violation 356. Under 355, you have to be contending that it's no longer effective, do you not? It's effective for the things that were approved, but it's not effective for the product that they were selling. So just to give a simple... Is the approval effective? Is the approval effective if you have changed your manufacturing facility? I guess I'm trying to make sure I understand the question. The approval is effective... If you've changed the manufacturing facilities, does that render the approval ineffective? And if that's the case, what statutory provision says that? The approval is still effective in the sense that if you do the thing that was approved, marketing the drug that you were approved to market, then if they still wanted to do it in Belgium, nobody's canceled their approval. They could still manufacture it in Belgium and market it. But the problem is that there's no approval effective for the particular product that they were selling, which was manufactured somewhere else. And that's the problem. And the way 356A comes into it, to answer the other part of your question, is that 356A is an authorization. And it says you can distribute a drug product despite having changed your manufacturing. And so the premise of that has to be that you otherwise couldn't have done that, because otherwise it wouldn't make any sense, if you follow the following steps. And so the point is you expand the scope of your approval. You say, all right, I was already approved to market it, you know, manufactured in this way. I expand the scope of it. Now I can market it manufactured in a different way. And if you do that... Couldn't it also be read that your application is still effective, but you need to know that if you change your manufacturing facilities, you have to do something else. In fact, it doesn't say under 356 that if you change your manufacturing facilities, you'd better file a new application, does it? No, it doesn't. All it says is... So your application is still effective. I think we're in agreement on that point. And the only question is what have you been approved to do? And the defendant's position, as I understand it, is once you have an approved application to market, to introduce the drug into interstate commerce, then you're approved not only to do it in the way that you had to describe to FDA, that FDA had to check to make sure that you would preserve the identity and purity of the drug and all of those things, but you could just turn around the next day, start manufacturing it somewhere else that FDA has never looked at. But then you risk withdrawal or suspension. You risk the criminal penalties for failure to disclose, which is one of the counts against your client here. So you have a problem if you change something. But the problem is not that your application is rendered ineffective, is it? The problem is that you have no approved approval that's effective with respect to what you're actually doing, the drug that you're actually selling. I mean, we know that the reference to the drug can't be in that provision, can't be just to the composition of the drug, to hydroxyzine. Because there's got to be, I mean, the whole point of generic approvals is that there's already an approval on file for hydroxyzine for somebody else. The point is that the defendants here came in and they said, we want to market this drug. Here's how we're going to do it. Here's where we're going to do it. Is that okay, FDA? And FDA says, yes, that's okay. You can market this already approved by somebody else drug in those circumstances. And then that's what they have approval to do. And then if they continue to do that, or if they went back to doing that, they would be fine and nobody would be complaining about it. But what they instead did was said, we have, we're going to just change and do something that FDA has never looked at. And that's the whole point of the scheme. I'm curious as to why you're pressing this issue. There already is a count against you for failure to disclose. What does this get you that the other counts, failure to disclose and mail fraud, what does this get you in terms of criminal penalty or liability or enforcement? I'm a little confused by that. I mean, the case hasn't gotten that far in terms of how this is going to unfold. But just fundamentally, the thing that they did wrong here is, the whole point of the scheme, as was described in one of the cases cited in our brief, the Eighth Circuit case, is that FDA has a closed system. And if you want to market a drug, then you have to get approval. And you get approval, and they don't just approve the composition, they approve where you're going to do it, how you're going to do it. And consumers in America are entitled to know that when they buy a drug, that that has been pre-approved by FDA, that the manufacturer has given the information to FDA, FDA has had a chance to check it out, and the consumer can be safe. What happened here was they said, we're going to go to a different facility, FDA hadn't looked at it with respect to this drug. As it happens, had recently looked at it and discovered problems at the facility. And they said, we're just going to go manufacture the drug there, and we're going to put it on the shelves for consumers to purchase, without anybody having looked at it and examined it in the way that is required before you market a drug in the United States. And so that's fundamentally what they did wrong, and it's totally natural that that would be the count that we would charge here. But where the statute gets you is it allows the FDA to come in and withdraw or suspend. It gives you criminal liability for failure to disclose, whether it's a major manufacturing change or whatever. There are plenty of provisions in the statute that say this violates the law. I'm still not sure what this gets you that the other provisions don't. All right. Well, no, I did, actually. Criminal charge is a serious business. FDA does good work. But as far as I know, there was no withdrawal. There was no letter that went out. And actually, on appendix page 20, the district court pointed out, significantly the superseding indictment does not charge that KVK manufacturer distributed an adulterated or misbranded drug. I just don't know why this isn't an administrative matter in the normal course. They didn't take any action administratively, as far as I know. Am I mistaken? I mean, there was a lot of back and forth between FDA and KVK administratively before these charges were filed. There's no recall. We'll give you extra time. There's no recall. There's no withdrawal of the application or, I mean, the usual administrative stuff, right? It went straight to criminal. There was a recall, and that's cited. There's recall notices in the appendix. They tried to get these drugs back. You know, there was conduct here, obviously, which is not directly at issue here about lying to or misleading the FDA. I see 1001, you know, according to the indictment. I understand that. But just to get directly to your question, Your Honor, because I think it's an important one. Fundamentally, what the defendants were doing was selling a drug to the American public under circumstances where FDA had not approved the sale of that drug manufactured at that place in that way. And that is, that goes to the core of FDA's mission. The point, there's a closed system. The idea is that if you want to market a drug, you have to submit to FDA not only what the drug is, not only the composition, but also where it's going to be manufactured. And if you just, if manufacturers could just say, okay, well, we'll take the risk. Maybe if we manufacture it somewhere else, if we sell drugs that FDA hasn't checked out to consumers, consumers can use them. Maybe it'll turn out great. Maybe no one will get hurt, but maybe somebody will. And if the only risk to us is that FDA will withdraw the underlying approval, that's very different from saying no. The rules are here, simple. If you want to market a drug to the American consumer and tell them that it's safe and effective for its intended use, which is what you have to do, then FDA has to approve it ahead of time. And they knew this. Because originally, they were only going to do it in. Go ahead, Judge Rendell. Oh, shoot. Okay. When they knew this, when they originally marketed it, originally they were only approved for Belgium, and then they wanted to do Italy also, and so they went to FDA. And they said, can you inspect Italy, make sure it's okay for Italy. FDA said fine. And so they weren't caught by surprise here. This is Greg over Zoom. I'm going to get Judge Rendell back on the call because she did disconnect. Okay. Why don't we hold up just for a second and let Judge Rendell come back. We can all take a breather for a second. Thank you, Your Honor. Are there any Eagles fans here? Oh, man. All right. Judge Rendell is reconnecting. I'm really sorry. Okay, Judge, we have you back. We're just waiting for your picture. Good old technology. Judge Rendell, I think you were asking a question. Yeah, I still get back to exactly where, what statute is violated. Tell me the provision that authorizes this to be a criminal violation. Well, so 355A says that you can't introduce a drug into interstate commerce unless an approval is effective with respect to such drug. And as I mentioned earlier, we know that such drug can't just mean hydroxyzine generally because each individual manufacturer has to have their own approval. Everybody seems to agree about that. Otherwise, the generic drug approval would be a nullity. So we know that for the particular batch of hydroxyzine that you're marketing, you need to have approval. And here, their approval was, they had approval, but it was for something else. It was to market it in Belgium or to market it in Italy. And just to add one last point on this. Now, 356A confirms it. Now, the defendants have made a big deal about the fact that 356A is not enforceable by criminal penalties. And they're absolutely right about that, but it cuts against their position rather than in favor of it. Because what 356A says is that you may, if you have an approval, you can distribute the drug, despite the fact that it's manufactured in a way different from what's already been approved under certain circumstances. Now, you wouldn't need a provision like that if the defendants were right. If the defendants were right, then once you had the approval, you could just make your manufacturing change and you would be authorized to do so. And then maybe you'd be subject to withdrawal or the other things. But the only reason you need that provision is that without it, if you don't get that approval, which is what happened here, you don't have authorization to sell that drug with that manufacturing change. And so that underscores, I don't think we need it, going back to the very first question that I was asked. I don't think we need that to prove our case. But if there was any doubt about the subject, the existence of that provision makes clear that it has to be how this works. Otherwise, I don't know what that provision would be doing. It provides authorization that wouldn't otherwise exist. And they didn't take advantage of it, and therefore they don't have the authorization. And for that reason, the judgment should be reversed. I know I'm way over my time, but I'm happy to answer more questions. Judge Sirica has a question. Judge Rendell, do you have something else? I have something else. I do, too. Let Judge Sirica go first. Judge Sirica? You say in your brief that any deviation from the accepted application is actionable. Did you mean any material deviation? I'm not sure we focused on that, because this is so obviously material. I think the question of what wouldn't be material in terms of what you've submitted and what's approved might be a difficult one. So I'm not sure that that question is really teed up here. Well, it's your position that a material deviation occurs when the manufacturer or the manufacturing process has failed. That has been changed, I take it. Yeah, I mean, certainly if it's a different facility. I mean, one of the things you have to do is identify the facility that's expressed on the face of the statute. And FDA is supposed to ensure that manufacturing through the process identified at the facility identified, you know, will preserve the identity and purity and so forth of the drug. And so certainly if you go to a different facility altogether that FDA has never looked at, I mean, that has to be material. There's no way you could argue otherwise. A comment on the Cabell case. Your opponents say that this decides the issue in this particular case. Why is it different? Well, in Cabell, the defendant was not the drug manufacturer who originally made the drug. It was the down-the-line distributor, and the court made a big deal of that and said that was significant. And the manufacturer in that case had done everything. It was clear that the manufacturer had done exactly what they were supposed to and exactly what they were approved to do. And the question in that case, the contested question was whether someone further down the supply chain, you know, whether they had sort of manipulated the drug enough that instead of just sort of passing along the drug that was already approved, they had sort of created, you know, they had changed it so that now they were, you know, marketing their own drug. And, you know, that case, you know, has been read narrowly by other courts. But regardless of, you know, that whole issue, which you can put to one side for purposes of this case, nothing in that case suggested that if the manufacturer itself put on the market a product that was not in compliance with the manufacturer's own approval, that that would be okay. I mean, the court just didn't have a question remotely like that before it. It was a question of what someone else down the supply chain who receives the proper approved drug, what that person can then do. That's what the case was about, and that's why it doesn't have a lot of bearing here. Judge Rendell, did you have a question? Well, I read KBEL differently because the statute says no person, and clearly they were looking at KBEL as the distributor as being within that. But it had to do with repackaging. Would you say that repackaging is any different from putting it, manufacturing it in a different facility? Because it seems to me that Judge Hastie closed the door by this language. It would require an unwarranted distortion of the normally understood meaning of the language, saying, you know, new drug means what it means, and this is not a new drug. So would you say packaging, repackaging, is that different from putting it, manufacturing it in a new facility? Well, I mean, repackaging implies that it's already been packaged by the original manufacturer. And so in the very, you know, core of what the court was talking about, it was saying this is somebody who does something different from making the drug in the first place. I mean, there's no language in that opinion that suggests, I mean, as I mentioned earlier, the manufacturer in that case had complied with the terms of its approval. And the question in that, and the distributor in that case didn't have any approval at all. So it wasn't a question of the distributor deviating from some terms of what the distributor was or was not allowed to do. The question was whether the distributor had to be approved to market the drug, you know, based on what the manufacturer had already done and then what the distributor had then done. So, I mean, it's just a very different question. And, you know, there have been other cases and debates about, you know, how broadly it should extend in that separate context. And we contend it should be actually quite narrow even in that context. But certainly it doesn't say anything about what's happening here. Because the point here, everyone agrees that they had to have an approval. And the question is whether they acted within the terms of what had been approved. And clearly they didn't because one of the things that was approved was their manufacturing facility and they didn't use it. That's really all we're saying here. I had one last question. I'm wondering how common prosecutions under Section 355A are in cases involving new drugs that deviated from an ANDA or an NDA. How common is this? I don't know the answer off the top of my head, I'm sorry to say. I mean, I think going to the conduct here in particular, you know, there are a series of elements here that made this rise to the level of something that was worth criminally prosecuting. But, you know, I mean, I think most times manufacturers try to stay within the rules and they submit their, you know, if they want to change where they're, you know, how they're manufacturing. I mean, we're eventually going to have to decide whether when we decide this case if it's published or not. Is this something that's going to recur or is this something that's highly unique? That's really the only reason why I ask. I don't know the answer off the top of my head. That's fine. Judge Randall, do you have anything more? I'm fine. Thank you. Okay. Thank you. We'll hear you on rebuttal. Thank you. And we'll hear from the appellee's counsel. Thank you and good afternoon. My name is Jack Perizzolo on behalf of the defendant, KVK Tech. I just want to mention that counsel for the individuals, Patrick Egan and Justin Danilevitz, are here as well. And they've ceded their time to me for the full 15 minutes. And also present is Jeff Sanger as well on behalf of KVK Tech. Okay. Thank you. So I'd like to actually focus in on some of the questions regarding the statute. I just want to start there. And to answer Judge Randall's question about what in the statute says that what happened here rendered the application ineffective, that it was no longer effective. And the answer to that is nothing, nothing. In fact, under the statute and under the plain terms of 355, this application is still effective, still effective with regard to the drug at issue here, which is hydroxyzine. And so Judge Chigueras, I think you asked what's the position here of the government. And you would see, you can see plainly that they've tried to morph their position over time. So originally the way this was charged, and in fact the issue here is a narrow one, which is does the charge conduct violate this statute. And as you've pointed out, there's all kinds of other aspects of this case that are going back having to do with false statements. But with regard to that one issue, originally the government argued that the reason it was a, and they argued this in their, if you look at the motion to dismiss, you will see that they argued that it was a different drug. And the statutory term new drug, which is in 355A, is defined. And it's defined based on its composition. And so statutorily, this is not a new drug, because there is no allegation that it was changed in composition, and also no change in labeling. So the government here has said, okay, we're blowing some kind of huge hole in the statute. If there were a change to the labeling, this would be a problem. But that's not alleged. The only thing that's alleged here has to do with the issue of the fact that KDK obtained, by the way, they obtained it from the original, just so it's clear, they obtained it from the original manufacturer. That manufacturer had actually contracted it from Mexico. They obtained that, they obtained that API, but it was chemically identical. And there's no allegation of any kind that it was different. And that should dispose of the case. And so what's happened is Judge Bartle recognized that and said, look, I've got this statutory text in front of me that says it's a new drug. And so now they're saying, well, okay, it's not effective as to that drug. But if you actually look at the text... Excuse me. Yeah. Why is it one of the requirements for the ANDA that there be approval of the place of manufacture and the manufacturing process? It could be one of the requirements for approval. However, the question here is whether the violation of one of those requirements for approval makes the drug unapproved. And that's where the government's logic is a leap, right? So it may well be a requirement for approval of the ANDA. However, if it's violated, that doesn't necessarily mean that it renders the drug unapproved. And what the government has done here, they've just said, and it's just an it's a dixit, as we say in our brief. It's just unapproved. But that's not what the statute says. And if there's a violation, what the statute sets out in 355E is here is what happens. If you have an approved drug and you have a material understatement, for example, and that's in 355E, here's what happens. You have withdrawal. You are subject to withdrawal, and effectively that ends the problem. As I read some of the other courts of appeals decisions, they seem to assume they use the term unapproved drug. Is that an error? I mean, there's no real analysis there about that. There's sort of what happens here. You asked the question about how few cases there are. There are a few cases. And why is that? The reason for that is that the agency has so much power here, it is very, very, very rare for any manufacturer to actually challenge essentially even a potential ruling of the agency. And so the term unapproved, that's not even in the statute, by the way. It's just made up. And what happens is there's this lore that develops around it. All of a sudden, this lore people say is lore. But the issue here, particularly in a criminal case, is what does the statute say? And is there fair notice to somebody in the marketplace that this statute, with regard to this statute, is it actually a violation? And you have to go back to the text of the statute, which clearly, if you read the term new drug, which is a defined term, and by the way, there's a language in 355A that's such drug. So it's such drug refers back to the new drug. So the point I was going to make about the effectiveness point is with regard to a violation, the issue is what happens. Why wasn't a supplemental amendment sought by your clients? There's a real question in this context as to whether that was required at all. So the relevant regulations, so there's been some discussion about 356A, which has to do with different, if it's a major, minor, or immaterial change, what happens under 356A. And there are regulations, that's 314.70, that sets out the conditions. And there's a real question as to whether any supplement was required here at all. And in fact, in fact, the relevant guidance on this at the time, so if you look at it, it's cited in our papers, the 2015 guidance from the FDA noted that there was real confusion over, there was real confusion over whether or not, in the circumstances pursuant to which manufacturers actually had to provide supplements. The government has said today that this was clear, that this was a major change. That is disputed. And I will, and the idea that there's this background that if you don't comply with 356A, or if you make any change to the process, I think actually the language I just heard a few minutes ago is any change to the process, then that's going to trigger a violation of 355A. In this, in this space. In fact, if you read the 2015 guidance, it says, it says explicitly, certain chemistry manufacturing controls changes can be made solely under the pharmaceutical quality system without the need to report to FDA. So the idea that there's this background presumption, there's this flat ban with regard to manufacturing changes that don't otherwise get notified to the FDA, is simply not even the FDA's own position. And I see I've got... I'm still a little puzzled as to why it's made one of the requirements that the application includes the manufacturer, the place of manufacturing, the process of manufacturing, all for the purpose of ensuring the safety of the product before it is approved. So there's no, so those may be criteria that the FDA looks to for purposes of deciding whether or not to approve that ANDA. However, the FDA recognizes that there can be changes to the ANDA and changes to the manufacturing controls that don't have to be notified, that don't require notification to the FDA, that they recognize that explicitly in their guidance. And so the question here is, if there's a change, does it trigger a violation of 355A? The answer is no, no, with regard to the manufacturing process. Now, 356A, as we point out in our brief, was added in 1997. It was added for purposes of setting out these different criteria, but significantly, it was not added to 331D as a violation, as a prohibited act. So the issue, so with regard to 356A, which is what the government's relying on here, if you actually look at the statute that they charged here, 331D, it's not listed. Does 356 have a purpose? Yes. The purpose was to liberalize the ability of manufacturers to make changes to their processes. If you look at the legislative history of that amendment in 1997, it was deemed that the FDA was being too stringent in addressing manufacturing changes, and it was enacted in order to liberalize those conditions. That's what it was put in there for. But the FDA itself has recognized it's very confusing that you would not want to criminalize conduct. And remember, this is a strict liability criminal regime. And it just does not make sense. It makes eminent sense that Congress wouldn't have intended to have this type of change trigger criminal liability. It could very well trigger civil liability. If you look at the civil penalties provision of 335B, that's a civil provision. And the FDA has a remedy right there with regard to penalizing failure to disclose something like a change in a manufacturing site. That's how the statute is intended to work. They talk about it as a closed system. But it's closed in that sense, in that there's a remedy that's right there in the statute to apply to this particular issue. Could I address KBEL briefly? I see I'm running out of time. So this case is controlled by KBEL. And the logic of KBEL was very clear. It was explicit. I believe Judge Rendell just addressed it, which is the Court identified that in the context of the KBEL case, which, by the way, once you make changes to the product, you are a manufacturer. So the distinction that the government is trying to draw here is not correct. And the issue in KBEL, KBEL was being treated as a manufacturer. And so the logic was it was not a different new drug. And it did not require an additional separate application. That was the logic of KBEL. And the government is trying to do that again. When you say it's treated as a manufacturer, does that come from the language of no person shall introduce or deliver, or is there some other? That's correct. That is correct. So no person, that is correct. So it's not limited by a manufacturer or someone who, it's no person. And with regard to that particular issue, this idea of repackaging, in the brief, the government says, well, this is just a repackaging case. Well, first of all, there is no statutory basis for that argument at all. In fact, the very same subsection of the FDCA at KBEL is at issue here. It applies to manufacturing and packing. And so there's no reasonable basis upon which to distinguish the circumstances of KBEL from the circumstances here. It does apply to repackaging, but not by a manufacturer, by a distributor. I'm sorry, Your Honor, I did not hear. There was no manufacturer at fault in the KBEL case. KBEL in that case was being treated as a manufacturer because they were changing the product. They were changing the packaging. They were changing the packaging, correct. And so analytically, they are being treated as a manufacturer in that case. And I would just add, the idea that there's some special rule on repackaging, yes, there is a separate, with regard to repackaging, there is a separate repackaging statute, 353, which applies to repackaging. But the guidance that the government has cited, the 2017 guidance, says it rejects the position that they've put forward in this case, that somehow repackaging is separate and different from packaging for purposes of 355. If you read, I'll just give you the site, the 2017 guidance, page 3, footnote 8. If you look at that, you can also look at page 4, footnote 11, I believe. And you will see that they say, under 355, generally, that applies to repackaging. There is no analytic distinction between repackaging and packaging. And significantly, they say, but see KBEL. And what that means is that KBEL applies here. And it is the law of the circuit. And so there's no analytic basis to distinguish KBEL on these facts. If I could just have a moment. I just want to make sure that there's other things. If you have any other questions for me. Go ahead. I asked the government, what are they getting by charging this in addition to the other two counts that have been charged? Is this penalty much greater or what? Well, I think this is probably a question for them. But in my view, I think that they're upset about this. And I think, so there's some issues around the false statements. I think somebody pointed out, I think Judge Chigaris, that there wasn't even a warning letter in this case. So there wasn't even, so there was a back and forth. But you're not going to see alleged in the indictment that the FDA even took any civil administrative action at all here. They didn't even issue a warning letter. And that's because, who knows why, but the logical... The government says that your clients were not cooperative when they... So the lack of cooperation is probably why we're now here in court, candidly. However, the issue of cooperation and the false statements, the government has tried to suggest that that somehow is relevant here to the particular issue of whether or not it's an unapproved new drug. And that just confuses the issue. That's just polluting the issue. It's irrelevant, because their argument applies in the strict liability context as well. And so the only issue is the statutory issue as to whether this is an unapproved new drug. And it should be irrelevant whether they were cooperative or not. Now, why didn't they? I think you see in the indictment some suggestion about adulteration. And I think Judge Bartle pointed out, why wasn't this an adulteration case? Ordinarily, this case would be treated as adulteration and misbranding. The reason you don't see unapproved new drugs theories is because it doesn't really fit. In the context of this type of sort of industrial issue, almost all of these cases get charged as adulteration and misbranding. And so what does it get them? I think it allows them to put in, frankly, I think it allows them to pollute the record in terms of the evidence of what, with regard to the Dr. Reddy's lab and the warning letter related to the Dr. Reddy's lab, which was the Mexican manufacturer, what I think is actually going on here is that the government recognizes the jury appeal of having to be able to go in and say, oh, this came from Mexico. And because it came from Mexico, it's got to be bad. And so jury, you just, you don't draw any distinctions, you just go ahead and convict. And so that's what, you're asking me what I think? That's what I think. That's what it gets them. And we're obviously going to have a lot of evidentiary issues at trial, no question, but that's why they charge it the way they charge it. And frankly, they've said consistently that they could have charged it as an adulteration case, but they didn't. They didn't. And they chose this, and you may want to ask the government why they didn't charge it as an adulteration case. I have my theories as to why they didn't. But at the end of the day, legally, I don't think that really should make a difference. I think... Your adversaries point out the salutary purposes of the Food, Drug and Cosmetic Act, you know, and that there will be significant adverse public health outcomes here. Why are they wrong, if we don't agree with them? So our position is in no way inconsistent with the ability of the FDA to protect the public. I think we can all agree that they're interested in protecting the public. But the question is twofold. Number one, do you do that at the expense of personal liberty? Because understand what's at stake here. This is a criminal action against individuals. It's also a criminal action against the company, which effectively, if there's a conviction, that's the end of the company. This is the death penalty that we're talking about here. So the question is, first, do those considerations totally outweigh all of the other considerations with regard to protection of rights? Incidentally, there's no Chevron deference here at all, and I don't even think they contend otherwise. And that's in part because when you start to balance the personal liberty versus the protection of the public, they at least become an apropos. Let me put it that way. That's one. Number two, our position is harmonious with the statute. There's nothing that would prevent the FDA from enforcing what it wants to enforce with regard to this conduct in order to protect the public. As we pointed out, and there's two points I want to make. 355E sets out the procedure for what you do to withdraw the ANDA. That's what they can do. They absolutely can do it. And in this world, I will tell you that usually when the FDA says we're going to withdraw it, this is over. I mean, it's not even you don't see a lot of these cases because the FDA has so much power and authority that usually it's simply a voluntary withdrawal of the application. This is not a tough process for them to proceed. Do you have anything more? Judge Rendell, do you have anything more? I have nothing further. Thank you, Your Honor. Just a few points. I'd like to start with KBEL. Counsel said that KBEL was treated as a manufacturer in that case. We know that's not true. KBEL had no approval of any kind. The question was whether KBEL had to get an approval. That's what this Court said. And so if they were treated as a manufacturer, then it would have been an unapproved new drug because they had no approval. So it had to rest on that distinction. This Court said so in the opinion, but also just logically. And so the question is, what do you have to do in order to be treated as a manufacturer? Now, there's no question that the defendants here are manufacturers. In the opinion, Searle filed an application which was approved, and then KBEL repackaged. So there was an ANDA there. Searle had an ANDA, but the question is, and I'm on the second full paragraph of the opinion. The question was whether KBEL was required under 355A to file and secure approval of its own additional new drug application in order to repackage and wholesale that drug, meaning the drug that Searle had done. So they were not treating KBEL as itself the manufacturer. They were saying Searle already has approval. Searle already introduced it into interstate commerce pursuant to that approval. Everything was fine with that. Nobody's complaining about what Searle did. The question is whether KBEL also needed a new drug approval. And so if defendants' counsel were right that KBEL was a manufacturer and everyone agreed on that, then of course they would have needed approval, because every manufacturer needs an approval. The point was... They didn't need a new approval because all they were doing was repackaging. Right. All they were doing was repackaging. They weren't manufacturing. So the point is they didn't need themselves to have an approval. That's what the case was about. That's what the court said. That's the only way it makes any sense. It can't be the case that... It also makes sense because the whole idea was a change in composition. Because all they were doing was repackaging, they didn't need to file a new approval. That's the way I read it. The court was saying that doesn't make them themselves introducing a new drug. They're just passing along the drug from before. That's just a different point. Now, I'd like to go to 356A. I think defense counsel and I are in agreement on a couple of points about it. It was liberalizing the circumstances in which manufacturers could change their practices because it created this streamlined process where you could get... And FDA had some of this by regulation, but it set out in the statute circumstances in which you could say, I want approval. I want to expand my approval. I had approval to market under the circumstances described in my application. Now I want to distribute drugs that were manufactured a somewhat different way. And it gave them a way to do that. But the premise of that has to be that you could only do it... That your approval was only effective for what you asked for. And if you just look at the way that statute is written, it's clearly written that way. And that's why there's no criminal prohibition for violating it, because it's an authorization. But they don't fall within the terms of it. And I want to go back to the point about whether it was clear that they had to do this, putting aside the fact that they did it when they moved to Italy, so they clearly knew. But counsel cited the 2015 guidance. He cited some language that isn't actually on point. I don't want to go into the details of that. A simpler way to think about it, the conduct here was 2011, 2012, 2013. The guidance that was in effect was not the 2015 guidance, which was later. It was 2004 guidance, which is also cited in the brief. And the 2004 guidance said specifically, if you make a change in the facility, it's a major change if either FDA hasn't inspected the facility recently, or if FDA has inspected it and found problems. And otherwise, it's a moderate change. It says that in the 2004 guidance. That's the guidance that was in effect at the time of the conduct in this case. And there can be no serious dispute, or there should be no serious dispute, that they were required, that they couldn't comply with 356A and expand their approval without sending this to FDA ahead of time. I don't even think there's a dispute about whether it's major or moderate, but it's certainly one of those, and so they have to send it to FDA ahead of time. I want to just close by stepping back, and obviously I'll answer any questions, but just looking at the big picture here. Their position is, if you submit an application to FDA, the statute requires, and there's no dispute about this, that you say where you're going to manufacture it, what the process is going to be, FDA does a detailed inspection to make sure that's okay. Their position is, if you decide the next day, I don't want to manufacture it there, I want to manufacture it somewhere else, that maybe FDA could after the fact come after you and withdraw your approval. Or maybe there's some civil remedy for that. Or maybe if it turns out the drug is adulterated or misbranded or something else is wrong with it, they can go after you for that. But there's no prohibition on just doing that, on just saying, never mind what I got approved for, I'm going to do something else. And that is, in addition for all the technical reasons we've discussed, that's not a plausible way to read the words that Congress written, but it also just makes absolutely no sense whatsoever to say that you could take it, that you could, you know, Congress made you go through all these steps and, you know, FDA checks and you have your facility and all of that, and then if you change your mind and go to a different facility, then suddenly you're out of the pre-approval process and now FDA just has to chase you down. That's not the way this was set up. That doesn't make any sense. It's never been interpreted that way by anyone as far as I can tell. They were on clear notice that there were steps they were supposed to take to change their facility and they didn't do it, and that's why the judgment should be reversed. Can I, I'm going to take the appellee's bait and ask you, why wasn't this charged as an adulteration case? I mean, obviously a lot of things go into charging decisions, but I can give you a simple I can give you one explanation. Adulteration case usually involves taking the individual drug and saying it was manufactured under certain conditions that were unsafe or that something happened to the drug. They didn't tell FDA they were making this drug at this facility, so they sold it. It went out into the market, went to consumers. That's the problem. Now, perhaps the Department of Justice or FDA could have tried to go chase down the bottles and then try to prove that whatever adulteration occurred, assuming they could find them, occurred, you know, back at the facility as opposed to between then and when it got out the door. But, like, the problem, the fundamental problem here is that this was like off the grid. This was outside the system, and so that's what we charge. Because it's a lot harder when you have a manufacturer that doesn't tell you where they're making the drug. You can't inspect it. You can't go into the facility. You get in there years later. It's much harder to make out an adulteration case, and that's one reason among many that it makes sense to charge this. The problem with what they did here was they got approval to do one thing, and they did a different thing. And one of the consequences of that is that there's a grave risk, because FDA hasn't inspected the facility, and FDA hasn't looked at the processes, and FDA doesn't know that you're making the drug there, much less have signed off on it. And so there's a grave risk that it's adulterated. Is it easy to prove that it's adulterated if it's off your grid entirely? Maybe not. But that's a perfectly good reason to charge it the way it was charged, because that's fundamentally the problem with what they did here. Okay. Thank you, counsel. And we thank all counsel for their excellent briefing and argument today. We'll take the case under advisement and wish you well, and we'll call the next case when you all are ready.